# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                         |   |                 |
|-----------------------------------------|---|-----------------|
|                                         | : |                 |
| JULIE CHARBONNEAU,                      | : |                 |
|                                         | : | CIVIL ACTION    |
| Plaintiff,                              | : |                 |
|                                         | : | NO. 13-4323     |
| v.                                      | : |                 |
|                                         | : |                 |
| CHARTIS PROPERTY CASUALTY CO.,          | : |                 |
|                                         | : |                 |
| Defendant.                              | : |                 |

## MEMORANDUM

YOHN, J.                                                                June 30, 2015

On April 4, 2012, plaintiff Julie Charbonneau was living as a tenant at Bloomfield, a historic home in Villanova, Pennsylvania, when a fire destroyed the property. Charbonneau thereafter attempted to exercise an option under her lease to purchase Bloomfield from Jerald Batoff, the property's owner. During roughly the same period of time, Batoff was involved in negotiations with the issuer of his homeowner's insurance policy, defendant Chartis Property Casualty Company, which ultimately agreed to pay him $18.5 million (plus additional payments already made) as a result of the fire. Several rounds of litigation ensued between Batoff and Charbonneau, leading to a settlement agreement under which Charbonneau received $11 million of the $18.5 million and title to Bloomfield. Charbonneau subsequently brought this action against Chartis, claiming that Chartis's dealings with Batoff were improper and that she has been wrongly denied millions of dollars in additional insurance proceeds owed to her to cover the cost of rebuilding Bloomfield. Chartis has filed a motion for summary judgment, to which Charbonneau responded in opposition. Because there is a genuine dispute of material fact with

respect to only plaintiff's claim for intentional interference with contractual relations, I will grant the motion as to her other claims.

I.      **FACTUAL BACKGROUND & PROCEDURAL HISTORY**

In December 2011, Batoff and Charbonneau executed a lease/option agreement ("LOA") for Bloomfield, a property located in Villanova, Pennsylvania.  Pl.'s Resp. & Counterstatement of Facts to Def.'s Statement of Undisputed Material Facts ("Resp.") at 5 ¶ 19; Def.'s Statement of Undisputed Material Facts ("SUMF") Ex. A at 2.  Under the LOA, Charbonneau had the option to purchase Bloomfield from Batoff during the lease period for $3.9 million.  Resp. 6 ¶ 21; SUMF Ex. C at § 5(a)(iii).  In the event that Bloomfield suffered a casualty during the lease period costing more than $1 million to repair, the LOA further provided that Charbonneau could likewise exercise her option, and that she would also be "entitled to receive at closing a credit in the amount of any insurance proceeds paid to [Batoff], and an assignment [of Batoff's] rights to receive any unpaid proceeds."  Resp. 6 ¶ 22; SUMF Ex. C at § 17.  Bloomfield was destroyed by fire on April 4, 2012.  Resp. 6 ¶ 23; SUMF 5 ¶ 23.

At the time of the fire, Batoff held a homeowner's insurance policy for Bloomfield issued by Chartis Property Casualty Company.  Resp. 3 ¶ 10; SUMF 3 ¶ 10.  The policy provided for two different types of payments in the event of a covered loss: "Replacement Cost" coverage or "Guaranteed Rebuilding Cost" coverage.  Resp. 4 ¶¶ 14-15; SUMF Ex. A at 31.  As defined by the policy, "Replacement Cost Coverage means that for a covered loss [Chartis] will pay the reconstruction cost of your house or other permanent structures, up to the coverage limit shown for that location on your Declarations Page, for each occurrence."  *Id.*  The declarations page of Batoff's policy specifies that the coverage limit for his dwelling is $22,373,762.  SUMF Ex. A at

2.[1]  The policy further provides that Chartis will pay this reconstruction cost "whether or not you will actually rebuild your house or other permanent structures." *Id.* at 31.  By contrast, the policy states that "Guaranteed Rebuilding Cost coverage means that for a covered loss we will pay the reconstruction cost of your house or other permanent structure, for each occurrence, even if this amount is greater than the amount of coverage shown on the Declarations Page." *Id.*  A payment of the Guaranteed Rebuilding Cost, however, requires that "you must repair or rebuild your home or other permanent structure at the same location." *Id.*  The policy also contains a non-assignment clause providing that "[n]o one covered under this policy may assign or turn over any right or interest in regard to the policy without [Chartis's] written consent," as well as a commencement of suit provision that states the policyholder "agree[s] to bring any action against [Chartis] within one year after a loss occurs, but not until thirty (30) days after proof of loss has been filed and the amount of loss has been determined."  Resp. 4-5 ¶¶ 16-17; SUMF Ex. A at 18.

Both Batoff and Charbonneau retained the public adjusting firm Clarke & Cohen to assist with filing their respective insurance claims arising out of the fire.  Resp. 7 ¶ 24; SUMF 5 ¶ 24.  During this process, neither Batoff nor Charbonneau submitted a proof of loss to Chartis.  Resp. 7 ¶ 25; SUMF 5-6 ¶ 25.  On July 25, 2012, Batoff informed Charbonneau that he believed the option provision of the LOA was null and void and that Charbonneau was in breach of the LOA.  Resp. 8 ¶ 27; SUMF 6 ¶ 27.  By letter to Batoff on August 7, 2012, Charbonneau stated that she "hereby exercises the option" under the LOA.  The letter constitutes mostly a rebuttal to Batoff's claim that the purchase option was null and void or never existed.  Significantly, it contains

---

[1] Charbonneau denies Batoff's statement to this effect on the basis that "there is no coverage called 'dwelling coverage' referenced on the Declarations Page of the Homeowner's Policy," and because the policy "provides unlimited 'Guaranteed Rebuilding Cost' if certain conditions are met, above and beyond the $22,372,262 figure." Resp. 4 ¶ 13.  This is a distinction without a difference: the parties agree that in the event of a covered loss to Bloomfield, the Chartis policy provided either a payment of up to $22,372,262 (the "Replacement Cost") for damage to the dwelling with no rebuilding requirement, or an uncapped payment (the "Guaranteed Rebuilding Cost") that requires rebuilding of the house at the same location.  *See* Resp. 4 ¶¶ 13-15; SUMF 3 ¶¶ 13-15.

absolutely no reference to an assignment of the insurance proceeds.  Resp. 8 ¶ 28; SUMF Ex. H.

On August 15, 2012, Batoff sued Charbonneau in the Delaware County Court of Common Pleas,

and the case was subsequently removed to this district.  Resp. 9-10 ¶ 32; SUMF 7 ¶ 32; *see also*

*Batoff v. Charbonneau* (*Batoff I*), No. 12-cv-5397-WY (E.D. Pa. Sept. 21, 2012).  Shortly

thereafter, Batoff filed a second suit against Charbonneau and her co-tenant at Bloomfield, Dean

Topolinski.  Resp. 9-10 ¶ 32; SUMF 7 ¶ 32; *see also Batoff v. Topolinski* (*Batoff II*), No. 12-cv-

6673-WY (E.D. Pa. Nov. 29, 2012).

On September 16, 2012, Richard Cohen of Clarke & Cohen sent a letter to Chartis on

behalf of Batoff, stating in part:

> I think it is important to remind you that we are quickly coming to the end of the
> window Mr. Batoff has allowed me to continue discussing a negotiated deal.  If
> we are not able to come to an agreed figure by the end of the week, I am being
> directed to proceed with submitting our claim.
>
> As I told you when we spoke on Monday of last week, I had no room to negotiate
> from the figure I expressed would get this done.  Frankly I am a little surprised by
> your most recent offer based on the potential exposure to Chartis if we do not get
> a deal done.  The figure I gave you is a significant savings to Chartis and I think
> we both agree we will get to the total policy limits as well as far into the
> guaranteed replacement cost provision the longer this continues.

Resp. 10-11 ¶ 35; SUMF Ex. K.  On October 1, 2012, Chartis and Batoff reached a settlement of

Batoff's insurance claim, under which Chartis agreed to pay Batoff an additional $18.5 million.

Resp. 12-13 ¶ 40; SUMF 9 ¶ 40.  Batoff also released Chartis from any further "claims,

demands, damages, actions or other form of proceedings of any kind whatsoever" arising out of

the fire, released Chartis from any claims of bad faith under 42 Pa. Cons. Stat. Ann. § 8371, and

agreed to indemnify Chartis against any future claims arising out of Batoff's policy, specifically

including claims made by Charbonneau or Topolinski.  Resp. 13-14 ¶¶ 42-43; SUMF Ex. F.

On October 1, 2012, Charbonneau filed counterclaims in *Batoff I*, seeking various forms of relief, including a declaration that "[a]t the closing, Defendants have the right to be assigned Mr. Batoff's rights to receive any insurance proceeds paid with respect to the Property post-closing . . . ." Resp. 14-15 ¶ 46; SUMF 11 ¶ 46. Charbonneau further requested specific performance such that "[a]t the closing, Jerald Batoff shall assign to Defendants the right to receive any insurance proceeds received post-closing . . . ." Resp. 16-18 ¶ 47; SUMF 11 ¶ 47. Charbonneau made essentially the same requests for relief in her amended counterclaims in *Batoff I*, filed on October 22, 2012. Resp. 18-21 ¶¶ 48-50; SUMF 11-12 ¶¶ 48-50.

On April 5, 2013, Charbonneau entered into a settlement agreement and mutual release with Batoff, under which Batoff agreed to disburse to Charbonneau $11 million in insurance proceeds that Chartis had previously paid to him. Resp. 23-24 ¶¶ 54-55; SUMF Ex. P. Moreover, Batoff agreed to convey title of Bloomfield to Charbonneau within ten days of the court's approval of the settlement. Resp. 24 ¶ 56; SUMF 13-14 ¶ 56. Batoff and Charbonneau further agreed to a mutual release and discharge of "any and all claims, demands, causes of action, obligations, damages, and liabilities" against one another. Resp. 24 ¶ 57; SUMF 14 ¶ 57. By its terms, the settlement agreement was fully integrated. Resp. 25 ¶ 59; SUMF 14-15 ¶ 59. Title to Bloomfield transferred as agreed from Batoff to Charbonneau in May 2013 by way of a "modified stipulation" entered with the court, which did not include an assignment of any of Batoff's rights under his insurance policy. Resp. 26 ¶¶ 61-62; SUMF Ex. Q. Charbonneau admits that she never notified Chartis of an assignment from Batoff. Resp. 26-27 ¶ 64; SUMF 15-16 ¶ 64.

Charbonneau filed this lawsuit against Chartis on July 25, 2013. Chartis filed a motion to dismiss on September 20, 2013, which I denied on March 26, 2014. *See* Doc. No. 15. Chartis

moved for summary judgment on June 25, 2014, which I denied without opinion by order on October 16, 2014. *See* Doc. No. 49. Charbonneau subsequently filed an amended complaint on October 21, 2014. Chartis then filed this renewed motion for summary judgment on April 15, 2015. Charbonneau submitted a response in opposition on May 20, 2015, and Chartis replied on May 27, 2015.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Roth v. Norfalco, LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (citations and internal quotation marks omitted). To establish the existence or absence of a genuine dispute as to any material fact, a party must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "In evaluating the motion, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

## III.    DISCUSSION

Chartis has moved for summary judgment on every claim in Charbonneau's amended complaint: breach of contract (Count I), breach of the implied duty of good faith and fair dealing (Count II), intentional interference with contractual relations (Count III),[2] bad faith in violation of 42 Pa. Cons. Stat. Ann. § 8371 (Count IV), and a request for declaratory relief (Count V).

As a threshold matter, Charbonneau asserts that the court should decline to consider or otherwise deem waived many of Chartis's arguments.  First, Charbonneau claims that where Chartis raises arguments that it previously made in its earlier motion for summary judgment, the court has "discretion not to consider facts" in support of those arguments that were available to Chartis at the time but not relied on in that motion.  Opp. 8.  Second, Charbonneau contends that where Chartis raises for the first time here arguments that rely solely on facts that were available as of the prior motion, those arguments are waived "as a matter of Pennsylvania law."  *Id.* at 9.

These claims fail for several reasons.  Most importantly, the cases that Charbonneau cites do not support the conclusions that she reaches.  On the discretion point, Charbonneau relies entirely on *Krueger Associates v. American District Telegraph Company of Pennsylvania*, 247 F.3d 61 (3d Cir. 2001), in which the district court denied defendant's initial motion for summary judgment to allow for discovery, then granted its renewed motion.  The Third Circuit affirmed:

> [N]othing prohibited the district court from ruling on [defendant's] renewed motion for summary judgment.  Under the law of the case doctrine the district court's denial of [defendant's] initial summary judgment motion did not create any bar to the court's later reconsideration of the renewed motion.  After having turned down [defendant's] first try without opinion in an apparent effort to allow [plaintiff] to conduct discovery, the district court surely acted within its discretion in reconsidering the motion post-discovery.

*Id.* at 65-66 (citations omitted).  The fact that I denied Chartis's initial motion for summary judgment without opinion, which was filed before either party could take discovery, therefore,

---

[2] I will address this claim last, because the others are all closely related.

poses no bar to my considering Chartis's renewed motion for summary judgment now that the evidentiary record has had time to develop. Moreover, even if *Krueger Associates* can be read as authorizing the court not to consider some of Chartis's arguments, the stated rationale for doing so is self-defeating. Charbonneau contends that "the parties could have saved nearly a year of costly additional litigation" if, in its prior motion, Chartis had pointed to facts known at the time that it now says are dispositive. Opp. 8. But this claim, which is essentially an appeal to judicial economy, cuts against Charbonneau's position. It does not conserve judicial resources (nor does it comply with Rule 56) to deny the motion on this basis and then to have a jury serve as factfinder where there is no genuine dispute of material fact based on the fully developed record. Thus, for these reasons and to the extent it is a matter of discretion, I choose to hear Chartis's arguments.

On the waiver point, Charbonneau likewise cites only one decision that is binding on this court: *Allegheny International v. Allegheny Ludlum Steel Corporation*, 40 F.3d 1416 (3d Cir. 1994). There, the Third Circuit affirmed a denial of defendant's second motion for summary judgment, finding that its belatedly-raised argument had been waived. *Id.* at 1431. But that decision turned on the fact that the argument at issue concerned standing, as those particular arguments "'should be [raised] with reasonable promptness.'" *Id.* (quoting 6A Charles A. Wright, et al., *Federal Practice and Procedure* § 1554, at 407 (1990)). The Third Circuit did not lay down a general waiver rule of the kind that Charbonneau suggests. By the same token, every other case cited by Charbonneau on the topic of waiver—none of which controls here, in any event—is inapposite in some way.[3] I will therefore fully consider all of Chartis's arguments.[4]

---

[3] *Noble Biomaterials v. Argentum Medical, LLC,* No. 3:08-CV-1305, 2011 WL 4458796 (M.D. Pa. Sept. 23, 2011), concerned a renewed motion for judgment as a matter of law under Rule 50, not a renewed motion for summary judgment under Rule 56. *United States v. National Railroad Passenger Corporation*, No. CIV.A. 86-1094, 2004 WL 1335250 (E.D. Pa. June 15, 2004), and *Household Financial Services v. Mortgage Group*, No. 01 C 5567, 2004

## A.     Breach of Contract

Under Pennsylvania law, breach of contract claims must contain three elements: "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Charbonneau contends that a contract formed between herself and Chartis when she received her assignment from Batoff.  Amend. Compl. ¶¶ 77-78.  She argues that Chartis breached both "by expressly refusing in advance to pay [her] anything" and by failing to secure her "prior approval" before entering its settlement with Batoff.  Opp. 23, 19.  And she claims that she suffered damages "consisting of unpaid insurance proceeds" and "the reduced amount of insurance proceeds received in her settlement with Batoff."  Amend. Compl. ¶¶ 83-84.  Chartis offers numerous arguments in response, which I will address in turn.

### 1.     The non-assignment clause

First, Chartis asserts that no contractual relationship ever formed between itself and Charbonneau, as Charbonneau "could not have been assigned the Homeowner's Policy itself because the Policy included a non-assignment clause."  Def.'s Mem. Law Supp. Renewed Mot.

WL 2457781 (N.D. Ill. Oct. 29, 2004), both dealt with affirmative defenses that, under Rule 8, should have been raised in responsive pleadings or by motion.  *Sunlight Electrical Contracting Company v. Turchi*, No. CIV.A. 08-5834, 2011 WL 4086077 (E.D. Pa. Sept. 13, 2011), likewise discussed waiver under Rule 8, as well as the principle that a reply brief "is not intended as a forum to raise new issues."  *Id.* at *15 (quoting *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006)).  *Bakalis v. Golembeski*, 125 F.3d 576 (7th Cir. 1997), and *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664 (1st Cir. 1996), both addressed waiver of a qualified immunity defense, which must be raised expeditiously.  In *Council on American-Islamic Relations Action Network v. Gaubatz*, No. CV 09-2030 (CKK), 2015 WL 1021280 (D.D.C. Mar. 6, 2015), the court deemed as waived an argument that plaintiff raised for the first time in its opposition to a renewed motion for summary judgment, the plaintiff having not complied with the court's instructions to present that argument in an earlier filing.

[4] The court rejects Charbonneau's repeated arguments that the issues raised now were raised or should have been raised in Chartis's first motion for summary judgment.  That motion consisted primarily of a rehash of the arguments raised in the motion to dismiss, which had been fully analyzed in the court's memorandum accompanying its order disposing of the motion to dismiss.  At the time the first motion for summary judgment was filed, very little or no discovery had been taken, and the court declined to re-analyze the issues covered in the motion to dismiss.  It simply denied the motion for summary judgment in a one page order with minimal comments.

Summ. J. ("Def.'s Mem.") at 7.  As Charbonneau notes, however, the Pennsylvania Supreme Court has set out the "general rule" that "a non-assignment clause in an insurance contract is not enforceable after the loss has occurred."  *Egger v. Gulf Ins. Co.*, 903 A.2d 1219, 1224 (Pa. 2006).  Neither party disputes that, if an assignment occurred here, it took place sometime after the fire at Bloomfield.  Chartis argues, however, that the general rule does not apply in this case, because "[t]he reasoning articulated by Pennsylvania courts . . . is that, following a loss, the amount of the claim is generally fixed and there is no increase in risk in assigning the right to payment of a set amount," whereas here "the insurer's risk remains in question as the insured decides whether to take a lump sum payment within policy limits, or take advantage of the guaranteed rebuilding cost, which may or may not fall within policy limits."  Def.'s Mem. 15-16.  But *Egger* neatly rejects such an argument, explaining that it "confuses loss with the subsequent fixing of a precise amount of damages for that loss."  *Egger*, 903 A.2d at 1227.  Thus, the non-assignment clause in the homeowner's policy does not bar Charbonneau's breach of contract claim.

2.    *The Charbonneau/Batoff settlement*

Second, Chartis contends that no contractual relationship formed between itself and Charbonneau, because Charbonneau's settlement with Batoff did not include an assignment of any rights against Chartis.  Chartis reasons that the Charbonneau/Batoff settlement was "'fully integrated' to the exclusion of all other agreements and understandings," and so "the legal rights exchanged between Charbonneau and Batoff during the 'closing' on the transfer of Bloomfield were not governed by the terms of the disputed [LOA], but by the terms of their integrated settlement agreement."  Def.'s Mem. 13-14 (internal quotation marks omitted).  Charbonneau responds that her settlement "specifically addresses Chartis in one context but is silent about whether [she] relinquished her right to an assignment of the Chartis policy proceeds," and that

this omission "establishes that the parties recognized Chartis's role and further shows the parties expressly chose *not* to have the settlement affect [her] assignment rights." Opp. 19. Moreover, Charbonneau argues that the settlement only resolved claims between herself and Batoff; her claim for unpaid proceeds—against Chartis—was therefore unaffected. *Id.* at 20. The Third Circuit has held that "[u]nder Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Allegheny*, 40 F.3d at 1424 (citing *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980)). The court further explained that "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)). Here, the language of the settlement agreement does not unambiguously support either party's position. A genuine dispute of fact therefore exists as to whether Charbonneau's settlement with Batoff foreclosed her right to subsequently seek unpaid insurance proceeds from Chartis.

### 3. The Guaranteed Rebuilding Cost requirements

Third, Chartis claims that even if Charbonneau is entitled to an assignment of "unpaid proceeds," that term by definition cannot encompass Bloomfield's Guaranteed Rebuilding Cost. According to Chartis, "the Guaranteed Rebuilding Cost Coverage does not provide for fixed proceeds, but rather payment of an amount equal to rebuilding costs *if* the insured rebuilds." Def.'s Mem. 15. Therefore, the Guaranteed Rebuilding Cost is "not even available to an insured of Chartis' . . . until the insured is engaged in rebuilding the damaged property and incurs the claimed costs." *Id.* Looking to the text of the policy itself, the relevant provision states:

> Guaranteed Rebuilding Cost coverage means that for a covered loss we will pay the reconstruction cost of your house or other permanent structure, for each occurrence, even if this amount is greater than the amount of coverage shown on the Declarations Page. However, you must repair or rebuild your house or other

permanent structure at the same location. If not, the maximum payable is the coverage limit shown for that location on the Declarations Page.

SUMF Ex. A at 31. Chartis thus views the second sentence above as a precondition: under its reading, the policyholder must rebuild the damaged dwelling before seeking reimbursement in the amount of the Guaranteed Rebuilding Cost. Charbonneau disagrees, arguing that "[t]he intent of the provision is clear: rebuilding must occur at the same physical location. It is not intended to dictate that the policyholder (or his assignee) must front all rebuilding costs before requesting reimbursement from Chartis." Opp. 22. Once again, the text of the policy does not unambiguously support either party's interpretation, so there is a genuine dispute of fact as to whether Charbonneau can collect the Guaranteed Rebuilding Cost before rebuilding Bloomfield.

### 4.    The commencement of suit and proof of loss provisions

Fourth, Chartis maintains that Charbonneau is barred from bringing this claim—as well as the others—because she neither filed suit within a year of the fire nor submitted proof of loss. The policy provides that "[i]n the event of an occurrence which is likely to involve this policy . . . you or an insured person must . . . [s]end to us within sixty (60) days of our request, your signed sworn proof of loss . . . ." SUMF Ex. A at 17-18. The policy also states, "You agree to bring any action against [Chartis] within one year after a loss occurs, but not until thirty (30) days after proof of loss has been filed and the amount of loss has been determined." *Id.* at 18. It is undisputed that the fire at Bloomfield occurred on April 4, 2012, *see* Resp. 6 ¶ 23; SUMF 5 ¶ 23, and that this action was filed—more than one year later—on July 25, 2013, *see* Doc. No. 1. It is further undisputed that Charbonneau has not submitted a proof of loss. Resp. 7 ¶ 25; SUMF 5-6 ¶ 25.[5] There is also no evidence that Chartis ever "requested" a proof of loss from

---

[5] In its statement of undisputed material fact, Chartis asserts that "Charbonneau did not submit a proof of loss to Chartis under the Homeowner's Policy" and cites Charbonneau's deposition for an admission to that effect. *See* SUMF 5-6 ¶ 25. Charbonneau does not deny that she declined to submit a proof of loss; rather, she denies that she

Charbonneau, or that 30 days have elapsed since "proof of loss has been filed and the amount of loss has been determined."

Chartis argues that Charbonneau's missing the one-year deadline "is alone sufficient to justify summary judgment in [its] favor," and it cites only one case for support: *Stone v. Franklin Homeowners Assurance*, in which the court did find that plaintiff's failure to timely file a proof of loss warranted entry of judgment for defendant. No. 1:13-CV-32, 2014 WL 2860830, at *3 (M.D. Pa. June 23, 2014). But that holding turned on the fact that the policy in question was administered under the federal government's flood insurance program: the Third Circuit has explained that, because this program draws on "the United States Treasury, strict adherence to the conditions precedent to payment is required." *Suopys v. Omaha Prop. & Cas.*, 404 F.3d 805, 809 (3d Cir. 2005). Moreover, "[f]ederal common law governs the interpretation" of these policies, and "general doctrines of waiver and estoppel do not apply" in most such cases. *Id.* Here, no federal financial interests are so implicated, and the insurance policy at issue is interpreted under Pennsylvania law. This is a crucial distinction, because the Pennsylvania Supreme Court has held that "if conduct or action on the part of the insurer is responsible for the insured's failure to comply in time with [a commencement of suit provision], injustice is avoided and adequate relief assured by resort to traditional principles of waiver and estoppel." *Gen. State Auth. v. Planet Ins. Co.*, 346 A.2d 265, 268 (Pa. 1975). Charbonneau has pointed to evidence that Chartis intentionally kept its dealings with Batoff unknown to her, and that this secrecy explains the delay in filing suit. *See* Resp. 10 ¶ 34, 11 ¶ 37, 12 ¶ 39. Therefore, a genuine dispute of fact exists as to whether conduct on the part of Chartis is responsible for

---

"had any obligation to submit a proof of loss" or that "Chartis would ever have accepted a proof of loss on [her] behalf anyway." Resp. 7 ¶ 25. Charbonneau has therefore tacitly admitted that she did not file a proof of loss.

Charbonneau's failure to file this lawsuit within the one-year period, and as a result it cannot be determined yet whether Chartis has waived the policy's commencement of suit provision.

Chartis similarly errs in arguing that Charbonneau's claims are barred because she failed to submit a proof of loss. The Pennsylvania Supreme Court has long and consistently held that an insurer can waive a proof of loss requirement. In *Cara v. Newark Fire Insurance Company*, 167 A. 356 (Pa. 1933), for instance, the court held that where an insurer received "prompt notice" of a fire and "made no demand for formal proofs of loss," the policy's proof of loss requirement was waived. *Id.* at 357. Moreover, in *City of Pittsburgh v. Firemen's Insurance Company of Newark*, 76 A.2d 368 (Pa. 1950), the court stated that "waiver of proofs of loss required by an insurance policy need not be express but may be inferred from any act of the insurer evincing a recognition of liability." *Id.* at 370 (internal quotation marks omitted); *see also id.* at 370 n.2 (collecting cases). The Third Circuit has further instructed that "[w]hether or not the insurer by its conduct has waived the filing of the proof of loss or the final statement of claim in any case is a question of fact to be determined by the jury." *Am. Credit Indem. Co. of New York v. W. K. Mitchell & Co.*, 78 F.2d 276, 278 (3d Cir. 1935). Here, Charbonneau has pointed to evidence of Chartis's conduct suggesting that it waived the proof of loss requirement, most notably that "Chartis allowed Batoff not to submit a proof of loss, at his request." Resp. 7 ¶ 25 (citing Opp. Ex. C at 234-35). A genuine dispute of fact therefore exists as to whether Chartis waived its proof of loss requirement, and so at this stage it cannot be determined whether Charbonneau's claims are barred by her failure to file a proof of loss.

5. *The timing of the assignment*

Fifth, and finally, Chartis argues that even if Batoff did make a valid assignment to Charbonneau, that assignment must have taken place when Batoff and Charbonneau closed on

Bloomfield, by which point Batoff essentially had nothing left to assign.  To evaluate this claim, I look first to the terms of the LOA, under which the assignment arose.  It provides that, in the event of a casualty to Bloomfield:

> If the cost to repair any damage is more than $1,000,000, Tenant may elect to exercise its Option, and shall be entitled to receive at closing a credit in the amount of any insurance proceeds paid to Landlord, and an assignment [of] all of Landlord's rights to receive any unpaid proceeds.

SUMF Ex. C at 8.  In the context of real estate, closing is "the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred." *Black's Law Dictionary* (10th ed. 2014).  The parties do not dispute that title to Bloomfield transferred from Batoff to Charbonneau pursuant to a modified stipulation filed by both parties in *Batoff I* and entered as an order of the court on May 6, 2013.  Resp. 26 ¶¶ 61-62; SUMF Ex. Q.  Consequently, there can be no dispute that closing on Bloomfield took place—at the earliest—on May 6, 2013.  A plain reading of the LOA requires me to conclude that as a matter of law Charbonneau could not have received "an assignment [of] all of [Batoff]'s rights to receive any unpaid proceeds" any earlier than May 6, 2013.[6]

Charbonneau disagrees.  First, relying on *Shaffer v. Flick*, 520 A.2d 50 (Pa. Super. Ct. 1987), Charbonneau argues that as a matter of Pennsylvania law, she "earned an assignment of the policy proceeds" when she "affirmatively exercis[ed] her option" on August 7, 2012—or, at the latest, when "closing should have occurred on September 7, 2012, the date [she] proposed when she exercised the option."  Opp. 13, 11.  Second, pointing to an affidavit of "the attorney that drafted the Assignment Clause on [her] behalf," Charbonneau argues that the assignment clause was "intended" to mean that she "would be entitled to receive a memorialization of her assignment of insurance proceeds at closing, to present to the appropriate insurance company."

---

[6] In her deposition, Charbonneau conceded that she did not even request an assignment at closing.  *See* Charbonneau Dep. 307:9-308:15, Oct. 28, 2014 (SUMF Ex. E at 8-9).

Opp. 15; Whitman Aff. (Doc. No. 117) at ¶ 5.  Third, citing no authority, Charbonneau argues that Chartis's interpretation of the assignment clause is "strained" because it gives Batoff "exclusive control over when the closing happened, including the ability to settle with Chartis and sign away [Charbonneau]'s rights to the Chartis policy proceeds before closing."  Opp. 16.

These claims do not bear scrutiny.  On the first point, *Shaffer* did hold that although tenants had not exercised their option to purchase property until after that property was destroyed by fire, "it [was] necessary to relate the transfer of equitable title back to the date of the option contract in order to do equity between the parties," and therefore the tenants "were "entitled to have the proceeds of the insurance policy applied against the purchase price of the farm." *Shaffer*, 520 A.2d at 51-52.  But the court noted that this relation-back would not be warranted if "the parties [had] provided otherwise in their agreement."  *Id.* at 52.  Here, the parties expressly agreed that an assignment of unpaid insurance proceeds would occur "at closing" on Bloomfield. SUMF Ex. C at 8.  *Shaffer* is therefore inapposite.  On the second point, claims about what the drafter may have intended in writing the assignment clause are similarly misplaced, because Pennsylvania law "presum[es] that the writing conveys the parties' intent."  *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995).[7]  On the third point, Chartis's interpretation does not give Batoff "exclusive control over when the closing happened," because the LOA provides that once Batoff receives notice that Charbonneau has exercised her option, he "shall notify [her] as to the date of closing; which shall not be earlier than 30 days or later than 60 days after [his] receipt" of such notice.  SUMF Ex. C at 3 ¶ 5(a)(ii).  It is axiomatic that when a seller breaches an agreement on the sale of real estate, the buyer "may go into a court of equity

---

[7] I note that Charbonneau quotes the exact same portion of *Duquesne Light* in the related litigation between herself and Batoff, also before this court, in which she contends that a disputed contractual phrase is unambiguous.  *See* Defs.' Reply Mem. Law Supp. Mot. Dismiss Pl.'s Amend. Compl. at 4, *Batoff v. Charbonneau*, No. 2:14-cv-6879-WY (E.D. Pa. Feb. 17, 2015), ECF No. 31.

seeking to enforce the contract and to compel specific performance." *Payne v. Clark*, 187 A.2d 769, 770-71 (Pa. 1963). Indeed, Charbonneau sought specific performance on precisely this basis in her counterclaims in *Batoff I*. *See* SUMF Ex. N at 30-32. Thus, even under Chartis's interpretation, Charbonneau was not required simply to "wait around until Batoff, at his discretion, decided to allow a closing." Opp. 15.[8]

Even if any of Charbonneau's arguments were sound, however, "[u]nder Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Allegheny*, 40 F.3d at 1424 (citing *Mellon Bank*, 619 F.2d at 1011 n.10). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* (quoting *Hutchison*, 519 A.2d at 390). Here, "at closing" can be understood in only one way: the point at which title to Bloomfield traded hands. Charbonneau's arguments cannot transform an unambiguous term into an ambiguous one, so none of her arguments avoid the conclusion that—as a matter of law—the assignment from Batoff to Charbonneau could not have occurred before May 6, 2013.

Charbonneau admits that on October 1, 2012, "Batoff and Chartis reached a settlement for $18,500,000." Resp. 13 ¶ 40. The settlement provided that this payment (and others not at issue here) "shall constitute full satisfaction of all Claims by Batoff that have been, are or may be made under the Policy for damage to [Bloomfield] related to or arising in any way out of the

---

[8] Moreover, to the extent that Charbonneau views Chartis's interpretation as somehow unfair, Charbonneau responds succinctly to such an argument in her ongoing litigation with Batoff:

> "[T]he fact that parties do not agree on the proper construction of a contract does not render it ambiguous." *Paragon Tax Grp., LLC v. Broadview Networks Holdings Inc.*, No. CIV.A. 11-1699, 2012 WL 177410, at *6 (E.D. Pa. Jan. 20, 2012), *aff'd*, 503 F. App'x 161 (3d Cir. 2012). This is so even if a contract "may work a hardship or later seem unfair to one of the parties." *Little v. USSC Group, Inc.*, 404 F. Supp. 2d 849, 855 (E.D. Pa. 2005). Indeed, even if "the terms are harsh and unfair to the plaintiff, he voluntarily entered into the contract and must abide by its provisions." *Dodson v. New York Life Ins. Co.*, 36 Pa. Super. 551, 556 (1908).

Defs.' Reply Mem. Law Supp. Mot. Dismiss Pl.'s Amend. Compl. at 4, *Batoff v. Charbonneau*, No. 2:14-cv-6879-WY (E.D. Pa. Feb. 17, 2015), ECF No. 31.

Fire." SUMF Ex. F at 3 ¶ 1. It further declared that Batoff "release[d] and forever discharge[d] Chartis . . . from any and all claims, demands, damages, actions or other form of proceedings of any kind whatsoever, whether arising in contract, tort, or otherwise, that Batoff has, had, may have had, or may have against Chartis related to or arising in any way out of . . . any property damage to [Bloomfield] caused by, related to or arising in any way out of the Fire . . . ." *Id.* ¶ 2; *see also* Resp. 13-14 ¶¶ 42-43 (admitting the accuracy of these quotations). In sum, on October 1, 2012, Batoff received $18.5 million in full satisfaction of any claims made pursuant to his homeowner's policy as a result of the fire at Bloomfield, in exchange for which he released any contractual (or other) claims he may have had against Chartis arising out of the same event.

Even if there was an assignment on or after May 6, 2013, "An assignment is a transfer of property or a right from one person to another; unless qualified, it extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee." *Crawford Cent. Sch. Dist. v. Com.*, 888 A.2d 616, 619 (Pa. 2005). The Pennsylvania Supreme Court has further explained that "[u]nder the law of assignment, the assignee succeeds to no greater rights than those possessed by the assignor." *Id.* at 619-20. In short, "an assignee stands in the shoes of the assignor." *Id.* at 620. "Conversely, an assignee's right against the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto, and to all set-offs and counterclaims which would have been available against the assignor had there been no assignment, provided that these defenses and set-offs are based on facts existing at the time of the assignment." *Smith v. Cumberland Grp., Ltd.*, 687 A.2d 1167, 1172 (Pa. Super. Ct. 1997). Here, Charbonneau is the assignee, Batoff the assignor, and Chartis the obligor. If there was an assignment, Charbonneau's rights against Chartis are therefore limited under Pennsylvania law to whatever rights Batoff may have had against Chartis at the time of the assignment.

As a result, Charbonneau cannot sustain a breach of contract claim against Chartis for two independently sufficient reasons. For one, prior to the time of assignment on or after May 6, 2013, Batoff released "any and all claims" he had or may have against Chartis as related to the fire at Bloomfield, including those "arising in contract." SUMF Ex. F at 3 ¶ 2. "In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language." *Taylor v. Solberg*, 778 A.2d 664, 667 (Pa. 2001). Here, the ordinary meaning of the release's language would have prevented Batoff from bringing a breach of contract claim against Chartis arising out of the Bloomfield fire at any point after October 1, 2012, when the release was signed. Thus, an assignment of rights from Batoff to Charbonneau on or after May 6, 2013 could not have included the right to sue Chartis for breach of contract.[9] Charbonneau herself admits as much, stating that after October 1, 2012, "Batoff had no rights left to assign because Chartis . . . demanded and received a full release of all future claims under the policy." Opp. 4. For another, Batoff accepted the $18.5 million payment from Chartis in "full satisfaction" of any claims he had for damage to Bloomfield arising out of the fire. SUMF Ex. F at 3 ¶ 1. In other words, in May 2013 even if Batoff had assigned to Charbonneau his "right[] to receive any unpaid proceeds" from Chartis in the event of damage to Bloomfield, in October 2012 Batoff had already agreed that he had received all of the proceeds that Chartis owed him for damage to Bloomfield. Even if the release does not prevent Charbonneau from bringing a breach of contract claim against Chartis, therefore, Charbonneau—standing in Batoff's shoes—cannot argue after the fact that Chartis failed to pay in full under the policy.

---

[9] Because I find that Batoff agreed to this release before the assignment could have taken place, I need not address Chartis's argument that, even if Charbonneau received an assignment of viable claims, Batoff was able to release those claims after the fact due to Charbonneau's failure to provide Chartis with notice of the assignment.

6.  *The prior written consent clause*

Charbonneau offers one last alternative theory, arguing that the LOA "required Chartis to obtain [her] prior written consent before settling Batoff's claim, regardless of the option and any assignment of policy proceeds," and further that "Chartis failed to meet this requirement, alone establishing [her] breach of contract claim." Opp. 18-19. As the LOA provides:

> If the cost to repair any damage is more than $1,000,000, Tenant may elect to exercise its Option, and shall be entitled to receive at closing a credit in the amount of any insurance proceeds paid to Landlord, and an assignment [of] all of Landlord's rights to receive any unpaid proceeds. Landlord may make proof of loss; provided, however, that any adjustment of a proof of loss shall require the prior written consent of Tenant, which shall not be unreasonably withheld or delayed.

SUMF Ex. C at 8. Thus, Charbonneau did have some right to approve or deny an agreement between Batoff and Chartis following the Bloomfield fire. But this was a right that Charbonneau held against Batoff alone, because it is undisputed that the LOA is a contract between Batoff and Charbonneau. *See* SUMF Ex. C at 2.[10] "It is a well established principle of law that a contract cannot legally bind persons not party thereto." *Matter of Estate of Barilla*, 535 A.2d 125, 128 (Pa. Super. Ct. 1987). As a result, "Under Pennsylvania law, generally a person not a party to the contract cannot be liable for a breach." *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 n.4 (3d Cir. 1976). Charbonneau therefore cannot salvage her breach of contract claim against Chartis by asserting only that Chartis failed to secure her consent to its agreement with Batoff.

In sum, even assuming that (1) an assignment was valid despite the non-assignment clause in the homeowner's policy, (2) an assignment was valid despite not subsequently being

---

[10] There is no doubt that Charbonneau did settle all claims with Batoff concerning her right to consent to a settlement between Batoff and Chartis concerning the insurance proceeds. Charbonneau's counterclaims in the prior federal litigation included numerous references to her right to give prior written consent to such a settlement, and the April 5, 2013 agreement resolved all of the prior federal litigation. *See* SUMF Ex. P.

included in the "fully integrated" settlement between Batoff and Charbonneau, (3) Charbonneau is not required to rebuild Bloomfield before seeking its Guaranteed Rebuilding Cost, (4) Charbonneau is not barred from bringing this action even though she neither submitted a proof of loss nor filed suit within one year of the fire, and (5) Charbonneau did not consent to Chartis's agreement with Batoff, I must still find that there is no genuine dispute of material fact on the breach of contract claim, because Batoff assigned his rights to Charbonneau—if at all—on or after May 6, 2013, after he had already released any breach of contract claims that he may have had against Chartis on October 1, 2012. "Material facts are those that could affect the outcome of the proceeding," *Roth*, 651 F.3d 373, and the outcome is clear: these facts are undisputed and Charbonneau cannot prevail as a matter of law on her breach of contract claim. I will therefore enter judgment for Chartis on Count I.

> **B.     Breach of Implied Duty of Good Faith and Fair Dealing**

As I noted in a footnote to my order denying Chartis's first motion for summary judgment, "Neither party . . . submitted any appellate authority from the Pennsylvania courts or the Third Circuit as to whether the present state of Pennsylvania law allows a separate claim for breach of an implied duty of good faith and fair dealing in connection with a breach of contract claim." *See* Order, Oct. 16, 2014 (Doc. No. 49) at 1 n.1. The parties have not addressed the issue since that time, either, but the caselaw itself is quite clear. A party to an insurance contract can bring a contract cause of action for breach of the implied duty of good faith and fair dealing. *See Creeger Brick & Bldg. Supply Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151, 153 (Pa. Super. Ct. 1989) (stating that duty of good faith "arises under the law of contracts, not under the law of torts" and that this duty has "been imposed upon the relationship between insurer and insured"). But this duty "does not allow for a cause of action separate and distinct from a breach

of contract claim." *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013). Here, however, Charbonneau does exactly that, bringing a breach of implied duty of good faith claim (Count II) as a cause of action independent of her breach of contract claim (Count I).

Moreover, in examining the implied duty of good faith in Pennsylvania, the Third Circuit has held that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91-92 (3d Cir. 2000). Here, the allegations of bad faith that Charbonneau uses to support her implied duty of good faith claim are identical to those with which she supports her § 8371 claim (Count IV), which is indeed an established cause of action. As part of the implied duty of good faith claim, plaintiff alleges:

> 88. Chartis was prohibited from favoring one client's interest to the proceeds to the detriment of another client's interest. Chartis was prohibited from favoring one claimant's interest to the proceeds to the detriment of another. However, Chartis did exactly that in secretly negotiating the Chartis Settlement with Batoff.

> 89. In negotiating and entering into the Chartis Settlement with Batoff without notice to Plaintiff, Chartis breached its obligation to treat the equitable owner of the Property and who had an interest in the Homeowner's Policy proceeds with the requisite good faith and fairness as required by law.

> 90. Chartis also owed a duty of good faith and fair dealing to Plaintiff because she was a Chartis policyholder under the Contents Policies, and violated that duty in failing to inform her of the above-described conduct by Chartis which was contrary to her interests.

Amend. Compl. ¶¶ 88-90. Likewise, as part of the statutory bad faith claim, plaintiff asserts:

> 105. In violation of its duties to Plaintiff and in violation of Pennsylvania law, Chartis is liable under section 8371 by engaging in bad faith by:

>> (a) Knowingly and intentionally failing to treat Ms. Charbonneau and her interests in the insurance proceeds fairly;

>> (b) Knowingly and intentionally favoring any interest Mr. Batoff claimed in the insurance proceeds over and to the detriment of Ms. Charbonneau's interests in the same insurance proceeds;

> (c) Knowingly and intentionally failing to notify or otherwise disclose to Ms. Charbonneau the negotiation of the Chartis Settlement in order to avoid payment of the Guaranteed Rebuilding Cost;

*Id.* ¶ 105(a)-(c).  Because the allegations of implied bad faith duplicate the allegations for Charbonneau's claim for relief under the established cause of action created by § 8371, they cannot be brought as an independent cause of action as a matter of Pennsylvania law.  I will therefore enter judgment for Chartis on the implied duty of good faith claim (Count II).

### C.  Bad Faith in Violation of 42 Pa. Cons. Stat. Ann. § 8371

Pennsylvania's bad faith statute provides for particular remedies "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured."  42 Pa. Cons. Stat. Ann. § 8371.  There are two ways that a plaintiff can file suit under § 8371.  First, "in order to bring an action for bad faith against an insurer, one must qualify as an 'insured' as that term is defined in the policy."  *Seasor v. Liberty Mut. Ins. Co.*, 941 F. Supp. 488, 491 (E.D. Pa. 1996), *aff'd*, 116 F.3d 469 (3d Cir. 1997).  Second, "[u]nder Pennsylvania law an insured's claims against his insurer . . . under section 8371 . . . are assignable."  *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 239 (3d Cir. 2003); *accord Allstate Prop. & Cas. Ins. Co. v. Wolfe*, 105 A.3d 1181, 1188 (Pa. 2014).  Here, Charbonneau follows the second path, asserting that "[a]s Batoff's assignee, [she] has an interest in the proceeds of the Chartis policy and therefore can sue Chartis for refusing to pay her those proceeds."  Opp. 34.

On October 1, 2012, however, Batoff released Chartis "from any claims, demands, damages, actions, or other forms of proceedings of any kind whatsoever of or for bad faith, including but not limited to claims under 42 Pa.C.S.A. § 8371, arising in any way" out of the Bloomfield fire.  SUMF Ex. F at 3 ¶ 3.  Again, "an assignee's right against the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto, and to all set-offs and

counterclaims which would have been available against the assignor had there been no assignment, provided that these defenses and set-offs are based on facts existing at the time of the assignment." *Smith*, 687 A.2d at 1172. Moreover, it is not a matter of genuine dispute that Batoff assigned his rights to Charbonneau, if at all, on or after May 6, 2013. Even assuming, as before, that the assignment was valid and that Charbonneau is not otherwise barred from bringing this action, Charbonneau therefore cannot prevail on her statutory bad faith claim, because she stands in the shoes of Batoff, who could not bring such a claim himself after October 1, 2012.

Moreover, though § 8371 does not define the term "bad faith," the Third Circuit has "predicted that the Pennsylvania Supreme Court would follow the definition of bad faith, and test for liability, set out by the Pennsylvania Superior Court in *Terletsky v. Prudential Property & Casualty Insurance Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)." *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, No. 12-4450, 2015 WL 3634779, at *9 (3d Cir. June 12, 2015) (citation omitted). *Terletsky*, in turn, defined "bad faith" to mean:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

649 A.2d at 688 (quoting *Black's Law Dictionary* 139 (6th ed. 1990)). Thus, "[t]o recover under section 8371, a plaintiff must show by clear and convincing evidence that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Wolfe*, 2015 WL 3634779, at *9. Even if the § 8371 claim is considered a claim of Charbonneau's, not Batoff's, for all the reasons discussed above regarding the breach of contract claim, there is no genuine

dispute of material fact that Chartis's refusal to pay Charbonneau was neither frivolous nor unfounded. I will therefore enter judgment for Chartis on the § 8371 claim (Count IV).

### D. Declaratory Relief

In her amended complaint, Charbonneau alleges that "[i]nsofar as Chartis has breached its obligation to pay the Guaranteed Rebuilding Cost, [she] is entitled to a declaration of the reasonableness of the Rebuilding Plan, supplemented as necessary to take into account post-fire damage, and her right to the full cost to rebuild Bloomfield." Amend. Compl. ¶ 118. Accordingly, Charbonneau seeks "a declaration" that "[t]he full cost of the Rebuilding Plan for Bloomfield . . . is covered by the Homeowner's Policy" and that "Chartis must pay the full amount of the Guaranteed Rebuilding Cost as proven at trial." *Id.* As I found above, however, Chartis did not breach any obligation that it had toward Charbonneau. *See* Part III.A *supra*. Charbonneau has thus shown no entitlement to declaratory relief, whether under state or federal law.[11] As a result, I will enter judgment for Chartis on the declaratory relief claim (Count V).

### E. Intentional Interference with Contractual Relations

Finally, Charbonneau claims that Chartis intentionally interfered in her contractual relationship with Batoff by convincing Batoff to settle his insurance claim without securing her approval, as required under the LOA's "prior written consent" provision. *See* SUMF Ex. C at 8. Before analyzing this claim on the merits, however, I must briefly address Chartis's argument that it fails under Pennsylvania's "gist of the action" and economic loss doctrines. In Pennsylvania, the gist of the action doctrine is "employed to ensure that a party does not bring a

---

[11] Charbonneau argues that "[t]his Court can make such a declaration regardless of whether the Chartis policy has been breached." Opp. 24. However, "[i]n order to sustain an action under the [state] Declaratory Judgment Act, a plaintiff must allege an interest which is direct, substantial and immediate, and must demonstrate the existence of a real or actual controversy." *Com., Office of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014). Likewise, "The case or controversy requirement must be met regardless of the type of relief sought, including [federal] declaratory relief." *Armstrong World Indus., Inc. by Wolfson v. Adams*, 961 F.2d 405, 410 (3d Cir. 1992). Because there is no longer an "actual controversy" as to Chartis's obligations toward Charbonneau under the policy, Charbonneau cannot prevail as a matter of law on her request for declaratory relief.

tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). "[T]he mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract." *Id.* at 69. Rather, under the gist of the action doctrine, "a purported tort claim [is] properly dismissed by a trial court [when] the true gist or gravamen of the claim [is] for breach of a contract which existed between the parties." *Id.* at 68. Similarly, the economic loss doctrine assists in maintaining the distinction between tort and contract actions. *See Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F. Supp. 2d 329, 335 (E.D. Pa. 2003) (citing *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super. Ct. 1989)).[12] Under the economic loss doctrine, plaintiffs cannot recover "in tort economic losses to which their entitlement flows only from a contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002) (quoting *Duquesne Light*, 66 F.3d at 618). Neither doctrine applies here. Charbonneau's breach of contract claim alleges that Chartis violated the homeowner's policy, to which Charbonneau was arguably a party after she was assigned certain rights; her intentional interference claim, by contrast, alleges that Chartis wrongly caused Batoff to breach the LOA, a contract to which Chartis was never a party. As a result, these two claims cannot share the same gravamen, and consequently neither the gist of the action doctrine nor the economic loss doctrine bars the interference claim.

Turning to the merits, under Pennsylvania law, "[t]he elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows: (1) the existence of a contractual, or prospective contractual relation between the

---

[12] "Although the Supreme Court of Pennsylvania has not ruled on the viability of the economic loss doctrine, an en banc panel of the Pennsylvania Superior Court adopted the doctrine . . . [i]n *REM Coal Co. v. Clark Equipment Co.*, 563 A.2d 128, 134 (Pa. Super. Ct. 1989)." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002).

complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Ira G. Steffy & Son, Inc. v. Citizens Bank of Penn.*, 7 A.3d 278, 288-89 (Pa. Super. Ct. 2010). Pennsylvania courts generally look to the Restatement (Second) of Torts § 767 for guidance on the third prong. *See Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997). That section provides:

> In determining whether an actor's conduct in intentionally interfering with an existing contract or a prospective contractual relation is improper or not, consideration is given to the following factors: (a) [t]he nature of the actor's conduct, (b) [t]he actor's motive, (c) [t]he interests of the other with which the actor's conduct interferes, (d) [t]he interests sought to be advanced by the actor, (e) [t]he proximity or remoteness of the actor's conduct to the interference, and (f) [t]he relations between the parties.

Restatement (Second) of Torts § 767 (1982). On the first prong, the existence of a contractual relationship between Charbonneau and Batoff—here, a third party—is not in dispute. And on the fourth prong, there is without question a genuine dispute of fact as to whether Charbonneau has suffered damages by not being allowed to object to the agreement between Batoff and Chartis. Thus, the intentional interference claim turns on the second and third prongs, which "are closely related." *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008).

On the question of Chartis's intent, Charbonneau points to evidence suggesting that Chartis specifically meant to harm her in negotiating with Batoff to settle his insurance claim without Charbonneau's involvement, because Chartis knew that Charbonneau, unlike Batoff, would attempt to recover the full Guaranteed Rebuilding Cost for Bloomfield. Charbonneau cites the deposition of Chartis claims handler James O'Keefe, who stated that "it was never a secret that . . . [Charbonneau] was purchasing this home . . . and she wanted to bring it back to its

historical grandeur." O'Keefe Dep. 148:15-19, Sept. 16, 2014 (Opp. Ex. B). Likewise, Richard

Cohen's letter to Chartis on behalf of Batoff suggests that Chartis knew it would be more likely

to pay the full Guaranteed Rebuilding Cost if it did not timely reach an agreement with Batoff.

Resp. 10-11 ¶ 35; SUMF Ex. K. Moreover, Cohen stated in his deposition that Chartis allowed

Batoff not to file a proof of loss, because Batoff knew that "he wasn't able to write a proof of

loss without [Charbonneau's] approval." Cohen Dep. 234:1-235:5, Nov. 13, 2014 (Opp. Ex. C).

Chartis responds that it "had a legitimate interest in fulfilling its contractual obligations to

Batoff," Def.'s Mem. 26, but the Pennsylvania Supreme Court "has acknowledged that in most

cases the defendant's intentional conduct is done 'at least in part for the purpose of protecting

some legitimate interest which conflicts with that of the plaintiff.'" *Phillips*, 959 A.2d at 430

(quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971)). Thus, drawing "[a]ll

inferences . . . in the light most favorable" to Charbonneau as required at this stage, *Am. Eagle

Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009), a reasonable jury could find

that Chartis intended to harm Charbonneau's contractual relationship with Batoff when it

negotiated with Batoff to settle his claim without Charbonneau's consent.

      On the privilege or justification prong, Chartis argues that, because "[t]he only person

entitled to rights under the Homeowner's Policy was Batoff," it stands to reason that "Chartis

was privileged and justified in settling his claim under the Policy." Def.'s Mem. 26. Chartis is

correct that, as a long-settled matter of Pennsylvania law, it acted properly in dealing with Batoff

alone before he and Charbonneau closed on Bloomfield:

> On the execution of the contract of sale, the [buyer] became, in equity, the owner
> of the property—the [seller] holding it thereafter as his trustee, with a right to
> retain it until the purchase-money should be paid. . . . When, therefore, the
> [property] was burned, it was the [buyer]'s property that was destroyed; [seller]
> lost nothing; the [buyer] was still obliged to take the property and pay the
> purchase-money. The insurance company, however, became liable to pay for the

loss to the [seller], because . . . he, as respects third persons, not privy to the contract of sale, is still to be regarded as the owner of the property.

*Reed v. Lukens*, 44 Pa. 200, 202 (1863); *accord Mut. Ben. Ins. Co. v. Goschenhoppen Mut. Ins. Co.*, 572 A.2d 1275, 1277 (Pa. Super. Ct. 1990) ("If a seller has insurance on the property, the seller can collect the proceeds of the policy, but holds them in trust for the buyer, who is compelled to perform under the agreement of sale.").  Indeed, in *State Mutual Fire Insurance Company v. Updegraff*, 9 Harris 513 (Pa. 1853), the Pennsylvania Supreme Court went so far as to say that in such a situation, the insurer has "no equitable right to intermeddle between the [seller] and the [buyer].  Under such circumstances they must be content to respond to the party with whom they made the contract of insurance."  *Id.* at 521.  Likewise, the Third Circuit has explained that it generally "accord[s] substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern."  *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 665 (3d Cir. 1993).  These factors all weigh in favor of finding that Chartis's conduct was privileged or otherwise justified.

On the other hand, Charbonneau argues that in negotiating its settlement with Batoff, Chartis acted improperly—and knew it.  O'Keefe stated in his deposition that Chartis transferred the agreed-upon funds to Batoff quickly via wire payment, which they "don't do . . . every day."  O'Keefe Dep. 203:17-20.  Likewise, Chartis waived the requirement under its policy that Batoff file a proof of loss, specifically because Batoff would have needed to secure Charbonneau's consent to such a filing pursuant to the LOA.  Cohen Dep. 234:1-235:5.  Moreover, O'Keefe stated that in the negotiations with Batoff, Chartis's counsel "kept insisting on an indemnification from Mr. Batoff against any claims from Ms. Charbonneau" as part of their agreement.  O'Keefe Dep. 210:10-15.  Viewing all inferences in the light most favorable to Charbonneau, I conclude that this evidence could suggest that Chartis short-circuited its standard

procedures specifically to avoid the risk that it would have to deal with Charbonneau—who would seek the full Guaranteed Rebuilding Cost for Bloomfield—and that it sought indemnification from Batoff against Charbonneau in particular because it knew that its conduct could well give rise to litigation.  "Although this evaluation of interests is not always susceptible of 'precise definition,' it is clear that the central inquiry [in determining privilege or justification] is whether the defendant's conduct is 'sanctioned by the rules of the game which society has adopted.'"  *Phillips*, 959 A.2d at 430 (quoting *Glenn*, 272 A.2d at 899).  While it is a close question, a reasonable jury could find that Chartis's conduct violated these "rules of the game."  Therefore, a genuine dispute of material fact exists on the question of privilege or justification, and so Charbonneau's intentional interference with contractual relations claim (Count V) must move forward to trial.

**IV.    CONCLUSION**

Because there is no genuine dispute of material fact and Chartis is entitled to judgment as a matter of law on Charbonneau's breach of contract, breach of the implied duty of good faith, § 8371, and declaratory relief claims, I will enter judgment for Chartis on Counts I, II, IV, and V of the amended complaint.  I will deny the remainder of the motion and allow Charbonneau to proceed to trial on the intentional interference claim (Count III).  An appropriate order follows.